## AFFIDAVIT OF FBI SPECIAL AGENT GREGORY GERLACH

I, Gregory Gerlach, state:

### *AGENT BACKGROUND*

1. I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation ("FBI"). I have been employed by the FBI since September 2019. I graduated from the FBI Academy in Quantico, Virginia, where I received instruction on, among other things, methods of gathering evidence in white collar crime investigations.

2. As a Special Agent with the FBI, I have conducted numerous investigations into suspected violations of federal criminal law. I have been assigned to a health care fraud squad since 2020 and have become familiar with a variety of white collar fraud schemes, including those involving public and private health care benefit programs. I am familiar with and have employed various methods of investigation, including but not limited to, the review of documentary evidence such as insurance claims and bank records, visual surveillance, witness interviews, and the execution of search warrants. Through my education, training, and experience, I have become familiar with various methods by which individuals and businesses orchestrate and execute health care fraud schemes.

### *PURPOSE OF AFFIDAVIT*

3. I submit this affidavit in support of an application for a criminal complaint charging HENRY EZEONYIDO ("EZEONYIDO"), CHINENYE NWODIM ("NWODIM"), AQIYLA ATHERTON ("ATHERTON"), DARLINE COBBLER ("COBBLER"), BRENDON ASHE ("ASHE"), and ARIEL LAMBERT ("LAMBERT") with health care fraud, in violation of Title 18, United States Code, Section 1347, and for warrants to arrest each of these individuals. As set forth below, I have probable cause to believe that EZEONYIDO, NWODIM, ATHERTON,

1

COBBLER, ASHE, and LAMBERT participated in a scheme to defraud various health insurance companies by submitting fabricated claims seeking reimbursement for over one million dollars' worth of medical expenses purportedly incurred during international travel.

4.  This affidavit is based on my personal observations and review of records, my training and experience, and information obtained from other agents, investigators, and witnesses. This affidavit is not intended to set forth all of the information I have learned during this investigation but includes only the information necessary to establish probable cause for the requested complaint and arrest warrants.

5.  I know that Title 18, United States Code, Section 1347 provides that "[w]hoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both."

## *PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

### Relevant Individuals and Entities

6.  EZEONYIDO, NWODIM, ATHERTON, COBBLER, and ASHE are residents of Massachusetts.

7.  LAMBERT is a resident of New Jersey.

8.  Insurance Company A is a private health insurance company. ATHERTON, COBBLER, and ASHE were members of, and held health insurance policies with, Insurance Company A during the relevant time period.

9. Insurance Company B is a second private health insurance company. LAMBERT was a member of, and held a health insurance policy with, Insurance Company B during the relevant time period.

10. Insurance Company C is a third private health insurance company. NWODIM was a member of, and held a health insurance policy with, Insurance Company C during the relevant time period.

11. Insurance Company D is a fourth private health insurance company. EZEONYIDO was a member of, and held a health insurance policy with, Insurance Company D during the relevant time period.

12. Insurance Companies A, B, C, and D are all health care benefit programs.

**Background Regarding International Medical Claims (a/k/a Travel Claims)**

13. Generally speaking, when individuals residing in the United States require medical treatment while traveling abroad, they are responsible for paying any hospital or other medical expenses out-of-pocket. This is because international medical facilities typically do not accept most domestic health insurance plans, except where an individual has purchased medical traveler insurance, medical evacuation insurance, or a similar supplemental policy specifically designed for an international medical emergency.

14. When an individual with domestic health insurance (commonly referred to as a "member" of the health insurance company providing coverage) but without a supplemental international medical policy requires medical care while traveling outside the United States, he or she is typically responsible for paying the international health care provider for any services rendered out-of-pocket. Upon return to the United States, the individual may submit information related to the international medical event to his or her health insurance company seeking

reimbursement for out-of-pocket expenses paid to the international medical facility. Health insurance companies commonly refer to these types of claims as either "international claims" or "travel claims."

15. The precise reimbursement process for international claims varies by health insurance company and by the type of health insurance policy, but when a member submits such a claim, he or she often must include a variety of information and documentation to substantiate the incident requiring medical treatment, and the services provided, while traveling abroad. Although the required information and documentation varies depending on the insurer and the type of medical care received, commonly required records include:

    i. A standardized form (unique to each health insurance company) with the member's name, date of birth, contact information, insurance policy number, and general information about the international medical event;

    ii. Medical records reflecting the diagnosis, medical care received, and provider information;

    iii. A final, itemized bill from the treating facility;

    iv. Proof of payment for the services (paid by the member to the treating facility); and

    v. In the event of a traumatic injury such as a vehicle accident, shooting, or stabbing, copies of any police report(s) describing the circumstances of the incident.

16. Often included at the bottom of the standardized form referenced above is a place for the member to sign and date, utilizing either a physical or electronic signature. While specific

wording may vary, it is common industry practice for such forms to include an affirmation similar to the following:[1]

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.
>
> Member signature_____ Date:_____
>
> *Continued on reverse side*

17. International claims typically can be submitted in a variety of ways, including via email, fax, or physical mail, or electronically through a member's online health insurance portal.

18. Once the claim has been received and reviewed by the insurance company, the company determines whether to approve the claim and, if approved, remits payment to the member for some or all of the out-of-pocket expenses incurred as a result of the international medical event. Many health insurance companies typically reimburse their members for a significant portion of the cost of covered services rendered outside the United States.

### Information Provided by Insurance Company A

19. In and around April 2023, I received information from Insurance Company A regarding certain international claims that Insurance Company A's Special Investigations Unit had reviewed. The claims related to alleged injuries, including alleged traumatic injuries, purportedly suffered by various Insurance Company A members, including ATHERTON and COBBLER, requiring their hospitalization while abroad.

20. As part of this review, an investigator with Insurance Company A examined the documents Insurance Company A received in support of the alleged international hospitalizations and, in addition, queried the medical claims history for the members to identify whether they

---

[1] This excerpt appears on the "International Claims Transmittal" form utilized by Insurance Company A.

received medical care in the United States at the same time as their alleged international hospitalizations.

21. Based on this review, the investigator with Insurance Company A determined that the records submitted in support of the international claims at issue appeared to be fabricated, and that nearly identical fabricated records were submitted in support of multiple claims by different Insurance Company A members. In addition, the investigator found that some of the members had apparently received medical services in the United States at the same time the members claimed to be hospitalized abroad.

22. Among the claims reviewed by Insurance Company A were three claims submitted by or on behalf of ATHERTON. Specifically, ATHERTON (or someone acting on her behalf) submitted three claims (two of which were submitted electronically via Insurance Company A's online portal) totaling approximately $191,908 for purported international hospitalizations in 2019, 2020, and 2021 – resulting from an alleged appendectomy, stabbing, and shooting, respectively. The investigator with Insurance Company A found that the records submitted in support of these claims showed indications of forgery, alteration, or falsification. In addition, the investigator found that ATHERTON's medical claims history indicated that ATHERTON had received medical services in Marlborough, Massachusetts on or about September 23, 2020, when ATHERTON was purportedly hospitalized in Nigeria for the alleged stabbing.[2] Insurance

---

[2] Border crossing records maintained by United States Customs and Border Protection ("CBP") indicate that, as of August 2023, ATHERTON had not traveled internationally since in or around 2014.

6

Company A remitted payments totaling approximately $67,515 to ATHERTON for the 2019 (appendectomy) and 2020 (stabbing) claims.[3]

23. Also among the claims reviewed by Insurance Company A were two claims submitted by or on behalf of COBBLER. Specifically, COBBLER (or someone acting on her behalf) submitted two claims, both electronically via Insurance Company A's online portal, totaling approximately $234,243 for two purported international hospitalizations in 2021 resulting from an alleged shooting and an alleged vehicle hit and run. The investigator with Insurance Company A found that the records submitted in support of these claims too showed indications of forgery, alteration, or falsification. In addition, the investigator found that COBBLER's medical claims history indicated that COBBLER had received medical services in Boston, Massachusetts on or about July 11, 2021, when COBBLER was purportedly hospitalized in Namibia for the alleged hit and run.[4] Insurance Company A remitted a payment of approximately $73,817 to COBBLER for one of these travel claims.

### Federal Investigation

24. Based on the information provided by Insurance Company A, investigators from the FBI, the Insurance Fraud Bureau of Massachusetts, and the United States Postal Inspection Service initiated an investigation into individuals suspected of submitting fraudulent international claims, initially focusing on the individuals, including ATHERTON and COBBLER, identified by Insurance Company A. Upon reviewing financial records, and contacting investigators at other

---

[3] Insurance Company A initially paid ATHERTON's third claim as well, but later, after flagging the claim for potential irregularities, placed a stop payment on the reimbursement check and successfully recouped the funds.

[4] Border crossing records maintained by CBP do not reflect any international travel by COBBLER that corresponds with either of COBBLER's alleged international hospitalizations.

insurance companies, the investigative team identified other individuals – additional members of Insurance Company A and individuals with policies at several different insurance companies – suspected of participating in the submission of fraudulent international claims, including EZEONYIDO, NWODIM, ASHE, and LAMBERT.

25. Specifically, the investigative team obtained financial records for the individuals identified by Insurance Company A and found that certain members, including COBBLER, made relatively large payments to EZEONYIDO close in time to their receipt and deposit of reimbursement checks from Insurance Company A for international claims. For example, on or about June 25, 2021, Insurance Company A issued a check to COBBLER in the approximate amount of $73,817 for one of the international claims discussed in paragraph 23 above. COBBLER deposited the check into her personal bank account on or about July 7, 2021. Then, on or about July 13, 2021, COBBLER purchased a cashier's check, drawn on the account into which she had deposited the check from Insurance Company A, in the approximate amount of $47,981 payable to EZEONYIDO.

26. This led the investigative team to obtain financial records for EZEONYIDO, which show that, in addition to the cashier's check from COBBLER (which EZEONYIDO deposited into his personal bank account approximately two days after COBBLER purchased it), EZEONYIDO received large payments from other individuals, including ASHE and LAMBERT, around the same time. This, in turn, led the investigative team to obtain medical claims history for ASHE, a member of Insurance Company A, and LAMBERT, a member of Insurance Company B. As set forth below, both ASHE and LAMBERT (or someone acting on their behalf) submitted international claims that correspond in time with their payments to EZEONYIDO.

27. Records obtained from Insurance Company A show that ASHE (or someone acting on his behalf) submitted two claims, both electronically via Insurance Company A's online portal, totaling approximately $159,472 for two purported international hospitalizations in 2021 – one of ASHE resulting from an alleged appendectomy and one of ASHE's daughter (a minor dependent covered by ASHE's policy) resulting from her alleged contraction of malaria/acute pancreatitis while traveling in Ghana. Border crossing records maintained by CBP do not reflect any international travel by ASHE or his daughter that corresponds with their alleged international hospitalizations. In addition, the documents submitted to Insurance Company A in support of these claims appear to be fabricated. For example, the purported bank statements submitted as proof of payment for the alleged medical services contain identical transaction descriptions and amounts (but with different transaction dates) as those contained in the purported bank statements submitted by or on behalf of other individuals involved in the scheme. Insurance Company A remitted payments totaling approximately $145,674 to ASHE for these two international claims.

28. Financial records show that Insurance Company A issued two checks to ASHE, the first on or about June 10, 2021 and the second on or about July 12, 2021, in the approximate amounts of $55,085 and $90,587, respectively. ASHE deposited both checks into his personal bank account. On or about August 3, 2021, ASHE purchased a cashier's check, drawn on the account into which he had deposited the checks from Insurance Company A, in the amount of $60,000 payable to EZEONYIDO. EZEONYIDO deposited the cashier's check into his personal bank account on or about August 4, 2021.

29. Records obtained from Insurance Company B show that LAMBERT (or someone acting on her behalf) submitted two claims totaling approximately $87,117 for two purported international hospitalizations – one in 2020 resulting from an alleged stabbing and one in 2021 for

9

an alleged appendectomy. Border crossing records maintained by CBP do not reflect any international travel by LAMBERT that corresponds with either of LAMBERT's alleged international hospitalizations. In addition, the claim details – including the purported dates of service, country where the alleged medical event occurred, and alleged injuries – and the records submitted in support of the claims are nearly identical to the claim details and supporting documents submitted by or on behalf of other individuals involved in the scheme. For example, as shown below, the purported police report submitted in support of LAMBERT's claim for her alleged stabbing (in Nigeria) is nearly identical to the police report submitted to Insurance Company A in support of ATHERTON's claim for her alleged stabbing (also in Nigeria).

### *INSURANCE COMPANY B (LAMBERT) CLAIM FILE EXCERPT*

Our Ref:..................................Your Ref:..................................Date:..................................

Crime: Stabbing
Date: 20/09/2020
Case File: AB/512/451c
Officer: SGT. Ebuka Okenwa

Enugu State, Nigeria – On Sunday, September 20, 2020, at approximately 10:08PM, Enugu Police officers responded to parking lot of Jasper Hotel regarding a report of a stabbing victim on the ground. Upon arrival, officers located the victim in the parking lot suffering from stab wounds.

University of Nigeria Teaching Hospital responded to render medical aid. The victim was transported to the UNTH in an ambulance for further services.

Officers immediately contained the scene and canvassed for witnesses. Enugu State Police detectives responded and assumed the investigation. Preliminary investigation suggests the incident was random in nature, as the area is a hot spot area for arm robbers. The victim has been identified as Ariel Lambert, female 30 years of age, a Nigerian American who came to Nigeria on vacation to visit her ailing God mother. The motive for the physical encounter is arm robbery. Investigation is still ongoing and anyone with information about this case is encouraged to call Enugu State police command at 08032003514.

10

*INSURANCE COMPANY A (ATHERTON) CLAIM FILE EXCERPT*

```
Our Ref:..........................Your Ref:..........................Date:..........................

Crime: Stabbing
Date: 20/09/2020
Case File: AB/512/451c
Officer: SGT. Ebuka Okenwa


Enugu State, Nigeria – On Sunday, September 20, 2020, at approximately 10:08PM, Enugu Police officers
responded to parking lot of Jasper Hotel regarding a report of a stabbing victim on the ground. Upon
arrival, officers located the victim in the parking lot suffering from stab wounds.

University of Nigeria Teaching Hospital responded to render medical aid. The victim was transported to
the UNTH in an ambulance for further services.

Officers immediately contained the scene and canvassed for witnesses. Enugu State Police detectives
responded and assumed the investigation. Preliminary investigation suggests the incident was random
in nature, as the area is a hot spot area for arm robbers, due to the increase tension over the ENDSARs
movement. The victim has been identified as Agiyla Atherton, female, 32 years of age, a Nigerian
American who came to Nigeria to bury God mother. The motive for the physical encounter is arm
robbery. Investigation is still ongoing and anyone with information about this case is encouraged to call
Enugu State police command.
```

      30.      Financial records show that Insurance Company B issued two checks to LAMBERT, totaling approximately $85,549, for these international claims. LAMBERT deposited the first check, in the approximate amount of $38,840, into her personal bank account on or about February 10, 2021. Approximately one week later, on or about February 17, 2021, LAMBERT purchased a cashier's check, drawn on the account into which she had deposited the check from Insurance Company B, in the approximate amount of $20,968 payable to EZEONYIDO. EZEONYIDO deposited the cashier's check into his personal bank account on or about February 22, 2021. LAMBERT deposited the second check from Insurance Company B, in the approximate amount of $46,709, into her personal bank account on or about July 30, 2021. Shortly thereafter, on or about August 10, 2021, LAMBERT purchased another cashier's check payable to EZEONYIDO, drawn on the same account. EZEONYIDO deposited this check, in the approximate amount of $28,015, into his personal account on or about the same day.

11

31.     Based on the information set forth above and other evidence obtained to date, including IP address information, I believe that EZEONYIDO submitted fraudulent international claims on behalf of other participants in the scheme and/or assisted them in submitting such claims, and that the payments to EZEONYIDO from COBBLER, ASHE, LAMBERT, and others represent EZEONYIDO's cut of the fraud proceeds.[5]

32.     The same IP address, 98.216.31.67 ("IP Address 1"), was used in connection with the electronic claim submission process for several of the international claims under investigation, including for two of the three claims submitted by or on behalf of ATHERTON,[6] both of the claims submitted by or on behalf of COBBLER, and both of the claims submitted by or on behalf of ASHE.

33.     As of May 2023, IP Address 1 was assigned to "Henry Okafor" with a service address of 40 Jane Terrace in Brockton, Massachusetts. Law enforcement databases show that this

---

[5] Unlike COBBLER, ASHE, and LAMBERT, ATHERTON does not appear to have made any payments to EZEONYIDO during the relevant time period. Instead, financial records show that EZEONYIDO issued four separate cashier's checks to ATHERTON totaling approximately $27,117. Each of the checks was issued to ATHERTON within a week of EZEONYIDO depositing a cashier's check issued to him by a different participant in the scheme, and each of the checks is in an amount equating to approximately ten percent of the insurance reimbursement check issued to that participant. For example, as set forth in paragraph 28 above, Insurance Company A issued a $90,587 check to ASHE on or about July 12, 2021, and ASHE subsequently issued a $60,000 cashier's check to EZEONYIDO, which EZEONYIDO deposited into his account on or about August 4, 2021. Approximately two days later, on or about August 6, 2021, EZEONYIDO issued a cashier's check to ATHERTON in the approximate amount of $9,117, which equates to approximately ten percent of the original insurance payment to ASHE.

[6] ATHERTON's third international claim was submitted by mail – specifically, via the United States Postal Service's ("USPS") Priority Mail Express service. Insurance Company A provided the investigative team with a scanned image of the USPS Priority Mail Express envelope it received containing the supporting documents for this claim. The envelope reflects a postage date of October 28, 2019 and a postage amount of $25.50. Financial records for EZEONYIDO reflect a purchase in the amount of $25.50 on October 28, 2019 for "USPS PO 24008901."

12

has been EZEONYIDO's residential address since approximately mid-2016.[7] In addition, the registered email user ID listed on the account for IP Address 1 begins with "Montey1987." EZEONYIDO's date of birth is September 22, 1987. Based on my training and experience, I know it is common for individuals to include a portion of their date of birth in their email addresses. Further, a potentially fraudulent international claim referred to law enforcement by a different insurance company was submitted using IP Address 1, and in the metadata of one of the documents submitted in support of that claim, EZEONYIDO is listed as the "author" of the document. Finally, financial records show that IP Address 1 was used to conduct online banking activity in an account held by EZEONYIDO, and the user ID for these online banking transactions is "HEZEONYIDO1987."

34. I believe that EZEONYIDO also played a role in, and shared in the proceeds of, fraudulent international claims submitted by or on behalf of NWODIM. Financial records show that EZEONYIDO and NWODIM hold a joint bank account – separate and distinct from EZEONYIDO's personal account referenced above – into which EZEONYIDO and/or NWODIM deposited three checks, totaling approximately $149,301, from Insurance Company C payable to NWODIM.[8] Records obtained from Insurance Company C show that NWODIM (or someone acting on her behalf) submitted the following three claims for alleged international medical events involving purported hospitalizations of NWODIM:

---

[7] "Henry Okafor" does not appear in law enforcement databases as a resident of this address. EZEONYIDO's first name is Henry.

[8] EZEONYIDO opened this account in or around September 2020. NWODIM was added as a joint account holder in or around February 2021, approximately one month prior to the deposit of the first international claim reimbursement check issued by Insurance Company C to NWODIM.

13

|  | Claim 1 | Claim 2 | Claim 3 |
|---|---|---|---|
| Dates of Service | 09/20/2020 to 09/24/2020 | 02/05/2021 to 02/08/2021 | 05/23/2021 to 05/31/2021 |
| Country | Nigeria | Nigeria | Botswana |
| Injury | Stab Wound | Appendectomy | Gun Shot Wound |
| Payment Issued to NWODIM | $34,301.75 | $42,309.71 | $72,690.16 |

35. Each of these three claims was submitted via email, from an email address containing NWODIM's full name. The metadata associated with certain documents submitted in support of the claims identify NWODIM and EZEONYIDO as the "authors" of those documents. For example, NWODIM is identified as the author of a file titled "Chinenye Nwodim Medical Bill," and EZEONYIDO is identified as the author of a file titled "Nwodim chest trauma."

36. Border crossing records maintained by CBP show that NWODIM entered the United States from Toronto on or about January 26, 2020 and stayed in the United States until on or about December 21, 2021, when she flew to Frankfurt. In other words, there is no border crossing record consistent with NWODIM being in Nigeria where she was allegedly stabbed in September 2020; there is no border crossing record consistent with NWODIM being in Nigeria where she allegedly received an appendectomy in February 2021; and there is no border crossing record consistent with NWODIM being in Botswana where she was allegedly shot in May 2021.

37. The investigative team obtained copies of the claim files submitted to Insurance Company C to substantiate the purported out-of-pocket expenses incurred by NWODIM in connection with these three alleged international medical events. The claim files include records such as bank statements purporting to show NWODIM remitting payment to the treating facilities, medical records purporting to show the medical care administered, and purported police reports describing the circumstances of the incidents in which NWODIM was allegedly stabbed and shot.

38. Based on my review of these and other records, and my training and experience, the records submitted to Insurance Company C in support of these claims appear to be fabricated. For example, the claim submission for the alleged shooting in Botswana includes a bank statement purporting to show that NWODIM remitted payment to Gaborone Private Hospital. However, the financial institution identified on this purported bank statement informed the investigative team that the account number listed on the statement is not a valid account number.

39. In addition, ATHERTON (or someone acting on her behalf) submitted a nearly identical bank statement, with the same invalid account number but with ATHERTON's purported relative listed as the account holder, to Insurance Company A in support of one of the three international claims referenced in paragraph 22 above. Screenshot excerpts of both purported bank statements, showing the same statement period and fictitious account number, are below.

*INSURANCE COMPANY C (NWODIM) CLAIM FILE EXCERPT[9]*

| SIMPLY RIGHT CHECKING | | | Statement Period 05/01/21 - 05/31/21 | |
|---|---|---|---|---|
| JASON NWODIM | | | | Account # 8940217840 |
| **Balances** | | | | |
| Beginning Balance | $190,496.22 | Current Balance | | $145,797.53 |
| Deposits/Credits | +$32,372.10 | Average Daily Balance | | $171,403.26 |
| Withdrawals/Debits | -$77,070.79 | | | |
| **Account Activity** | | | | |
| Date  Description | | Additions | Subtractions | Balance |
| 05-01 Beginning Balance | | | | $190,496.22 |

---

[9] To the best of my knowledge, there is no Jason related to or otherwise connected with NWODIM, nor is there a Jason related to or otherwise connected with ATHERTON.

15

*INSURANCE COMPANY A (ATHERTON) CLAIM FILE EXCERPT*

| SIMPLY RIGHT CHECKING | | | Statement Period 05/01/21 - 05/31/21 | |
|---|---|---|---|---|
| JASON ATHERTON | | | Account # 8940217840 | |
| **Balances** | | | | |
| Beginning Balance | $190,496.22 | Current Balance | | $97,564.86 |
| Deposits/Credits | +$32,372.10 | Average Daily Balance | | $171,403.26 |
| Withdrawals/Debits | -$125,303.46 | | | |
| **Account Activity** | | | | |
| Date Description | | Additions | Subtractions | Balance |
| 05-01 Beginning Balance | | | | $190,496.22 |

40. Similarly, portions of the medical records submitted in support of NWODIM's claim for the alleged shooting in Botswana are nearly identical to medical records submitted to Insurance Company A in support of one of ATHERTON's claims. As shown below, the records — purportedly from the same hospital — contain the same description of the alleged shooting as well as the same vital signs, address, phone number, and patient number.

*INSURANCE COMPANY C (NWODIM) CLAIM FILE EXCERPT*



Life Gaborone Private Hospital

| Name: Chinenye Nwodim | Gender: Female | D.O.B: 31/03/1988 |
|---|---|---|
| Address: 10 Fourth Circular Gaborone Botswana | Patient no: 15404 | Phone: 233 54 505 5240 |

The above-named patient is a 33 year-old female who was rushed to our accident and emergency department Gaborone Private Hospital with Abdominal gunshot injury. Patient who was on a visit to Botswana was said to have been attacked by robbers on her way to her residential accommodation.

At presentation, she was conscious, alert but disoriented. She was pale and was bleeding from the sites of the gunshot wounds. Vital signs were unstable with a pulse rate of 112bpm (weak and thready), Blood pressure of 80/55mmHg, respiratory rate of 30cpm, oxygen saturation of 92% and temperature of 36.2°c.

### INSURANCE COMPANY A (ATHERTON) CLAIM FILE EXCERPT

> **Life Gaborone Private Hospital**
> Plot 8448, Mica Way, Segoditshane, Gaborone, Botswana
> Private Bag BR-130, Broadhurst, Gaborone, Botswana
> Telephone: 00267 368 5600
> Telefax: 00267 390 1998
> www.lifehealthcare.co.za
>
> | Name: Aqiyla Atherton | Gender: Female | D.O.B: 28/10/1987 |
> | Address: 10 Fourth Circular Gaborone Botswana | Patient no: 15404 | Phone: 233 54 505 5240 |
>
> The above-named patient is a 33 year-old female who was rushed to our accident and emergency department Gaborone Private Hospital with Abdominal gunshot injury. Patient who was on a visit to Botswana was said to have been attacked by robbers on her way to her residential accommodation.
>
> At presentation, she was conscious, alert but disoriented. She was pale and was bleeding from the sites of the gunshot wounds. Vital signs were unstable with a pulse rate of 112bpm (weak and thready), Blood pressure of 80/55mmHg, respiratory rate of 30cpm, oxygen saturation of 92% and temperature of 36.2°c.

41.     The records submitted to Insurance Company C in support of the other two alleged international hospitalizations of NWODIM appear to be fabricated in similar ways. For example, purported medical records submitted by or on behalf of NWODIM in support of those claims show the same injury, date(s) of service, height and weight, and vital signs as those contained in purported medical records submitted in support of travel claims by other individuals under investigation.

42.     In addition to submitting fraudulent international claims on behalf of other participants in the scheme, or assisting them in submitting such claims, EZEONYIDO (or someone acting on his behalf) submitted a claim to Insurance Company D seeking reimbursement for a purported international hospitalization as a result of a gunshot injury allegedly sustained by EZEONYIDO while traveling in Botswana in 2021.[10] Border crossing records maintained by CBP show no international travel by EZEONYIDO at or around that time. Further, as shown below, portions of the medical records submitted in support of EZEONYIDO's claim to Insurance

---

[10] Due to its standard data retention period, Insurance Company D was unable to provide the IP address used to submit this claim; however, it was submitted via an online submission with EZEONYIDO listed as the submitter.

Company D are nearly identical to those submitted in support of one of ATHERTON's claims to Insurance Company A and one of NWODIM's claims to Insurance Company C, as set forth in paragraph 40 above.

### INSURANCE COMPANY D (EZEONYIDO) CLAIM FILE EXCERPT

**Life Gaborone Private Hospital**

| Name: Henry Ezeonyido | Gender: Male | D.O.B: 22/09/1987 |
| Address: 10 Fourth Circular Gaborone Botswana | Patient no: 15404 | Phone: 233 54 505 5240 |

The above-named patient is a 33 year-old male who was rushed to our accident and emergency department Gaborone Private Hospital with Abdominal gunshot injury. Patient who was on a visit to Botswana was said to have been attacked by robbers on his way to his hotel accommodation.

At presentation, he was conscious, alert but disoriented. He was pale and was bleeding from the sites of the gunshot wounds. Vital signs were unstable with a pulse rate of 112bpm (weak and thready), Blood pressure of 80/55mmHg, respiratory rate of 30cpm, oxygen saturation of 92% and temperature of 36.2°c.

43.   Financial records show that on or about September 15, 2021, Insurance Company D issued a check to EZEONYIDO in the approximate amount of $90,151 as reimbursement for this purported hospitalization. On or about September 28, 2021, EZEONYIDO deposited the check into his personal bank account. Approximately two days later, on or about September 30, 2021, EZEONYIDO transferred $90,000 from that account via a cashier's check payable to himself. The cashier's check was then deposited into the joint account held by EZEONYIDO and NWODIM (*i.e.*, the account into which NWODIM's three international claim reimbursement checks were deposited).[11]

---

[11] In October 2021, EZEONYIDO was charged (and has since pleaded guilty) to charges brought by the Office of the Massachusetts Attorney General for participating in a scheme to defraud health insurers by submitting false claims – separate and apart from those discussed herein – for medical services purportedly received while traveling abroad. Approximately one day after the charges were brought, EZEONYIDO issued a $120,000 treasurer's check to NWODIM, drawn on their joint account. NWODIM deposited the check into her personal account (on which she was the sole signatory) approximately one month later.

18

## *CONCLUSION*

44. Based on the information set forth above, I submit that there is probable cause to believe that EZEONYIDO, NWODIM, ATHERTON, COBBLER, ASHE, and LAMBERT committed health care fraud, in violation of Title 18, United States Code, Section 1347.

Subscribed and sworn to,

_____
GREGORY GERLACH
Special Agent
Federal Bureau of Investigation

Subscribed and sworn by the applicant via telephone in
accordance with Fed. R. Crim. P. 4.1 on July 10, 2024

_____
HON. JENNIFER C. BOAL
United States Magistrate Judge